WILLIAM E. RENNER, petitioner,

*v.*

ELFRIEDA RENNER, also known as ELFRIEDA RENNER LOWE, defendant.

[Decided August 6th, 1935.]

750

*Mr. George F. Losche,* for the petitioner.

*Mr. Patrick Henry Maley,* for the defendant.

CAMPBELL, A. M.

This is an action for divorce for the cause of adultery. Following the rule laid down in *Feickert* v. *Feickert, 98 N. J. Eq. 444; 131 Atl. Rep. 576,* petitioner contends that defendant took up her residence in Nevada for the purpose of procuring a divorce from him and without any intention of becoming permanently domiciled there; that she fraudulently concealed that fact from the Nevada court and succeeded in obtaining a decree as the result of such fraudulent concealment. The adultery complained of is the connubial intercourse which occurred as the result of defendant's marriage to Robert Ellsworth Lowe subsequent to the entry of her Nevada decree. Defendant's answer admits procurement of the Nevada decree but denies that it was fraudulently obtained. The parties were married in Ridgefield Park, in this state, September 20th, 1925, and cohabited there, as husband and wife, until September 22d or 23d, 1932. Dur-

ing the afternoon of one of the latter days defendant left petitioner and removed with their jointly owned household effects to her brother's home in Ridgefield, being a short distance from Ridgefield Park. She took with her the only child of the marriage, Henry Conrad Renner, who was then about three years old.

On October 31st, 1932, defendant filed her bill in this court for separate maintenance, alleging extreme cruelty. On the same day an order was entered directing this petitioner to show cause why he should not be compelled to pay maintenance and support *pendente* for defendant and the child. On June 12th, 1933, a consent order dismissing said bill was advised and filed.

On or about January 19th, 1933, defendant and the child left this state for a destination unknown to petitioner. On April 6th, 1933, she filed a complaint for divorce in Nevada for the cause of extreme cruelty. At the time of the Nevada decree defendant had resided in that state for the period required by its statutes to confer jurisdiction of the subject-matter of the suit and of the petitioner herein. Prior to and during that period the matrimonial domicile of petitioner herein was in this state; he did not voluntarily submit himself to the jurisdiction of the Nevada court nor was he served with process within that state. Jurisdiction over him was obtained by publication, in accordance with the statutes of Nevada and personal service of summons and complaint was made on him at his home in this state, on April 20th, 1933, by the sheriff of Bergen county. Adequate time was afforded him to answer and defend the suit. On April 24th, 1933, he filed his bill for injunction in this court, praying, *inter alia*, for an order directing this defendant to show cause why she should not be perpetually restrained from proceeding with her Nevada suit. that she be commanded to present the truth of the matters alleged and shown in said bill to the Nevada tribunal wherein her divorce proceedings were pending. and in good faith to urge that tribunal to discontinue her said action. The bill alleged, among other things, the pendency of her separate maintenance action in this court, and that by fraud and suppression of the truth she was

attempting to induce the Nevada court to adjudicate that her residence had been in that state for more than six weeks prior to the institution of her suit therein. On the same day an order was entered directing this defendant to show cause on May 15th, 1933, why she should not be restrained and enjoined according to the prayer of said bill. It was further ordered that defendant, in the meantime, and until the further order of this court, desist and refrain from all proceedings in her Nevada suit. True copies of said bill, the affidavits thereunto annexed, and of the said order, were ordered served upon defendant wherever she might be found, either personally or by mail. On May 15th, 1933, being the return day of the show cause order, defendant did not appear either personally or by counsel. Thereupon an order was entered to the effect that this defendant be enjoined and commanded to desist and refrain from all further proceedings in her Nevada suit until the further order of this court. It was further ordered that a true copy of said order be served upon defendant wherever she might be found, either personally or by mail. The show cause order, with its *ad interim* restraint and the permanent injunction, respectively, were forwarded by registered mail to defendant, directed to her post office address in Las Vegas, as set forth in her Nevada complaint. Both, however, were returned to petitioner's solicitor marked "unclaimed." Petitioner's bill for injunction has not gone to final hearing; as of record it appears to have been abandoned. However, and notwithstanding these orders, defendant proceeded with her Nevada suit, and on May 24th, 1933, was granted a final decree of divorce for the cause of extreme cruelty. On September 15th, 1933, defendant married Lowe at Las Vegas, Nevada. On the following day defendant and Lowe filed a petition in a Nevada court praying for an order permitting them to adopt said infant child. On the same day an order of adoption was entered.

On January 10th, 1934, a federal grand jury indicted defendant and Lowe for misapplication of funds and making false entries in the books and records of the Teaneck National Bank where Lowe had been employed as cashier. Thereafter, defendant and Lowe were apprehended in California and

brought to this state by federal agents. Pleas of guilty were subsequently entered and sentence was pronounced upon both. On September 3d, 1934, a child was born of the marriage of defendant and Lowe. Petitioner and defendant have not cohabited as husband and wife since September 22d, 1932. Since her apprehension in and return from California, defendant has remained in this state.

Petitioner testified, substantially, as follows: Prior to defendant removing from their home in September, 1932, they had quarreled frequently, the final break having occurred the night preceding such removal. He was present while the moving was in progress, saw defendant but did not speak to her. He remained a few minutes during which he obtained possession of some papers from the second floor and then left. A few days after the separation he wrote two letters to defendant requesting her to return to him. Both letters were forwarded by registered mail and copies retained. She did not answer them. He did not testify as to their contents. Thereafter he saw and talked to defendant but once and, to use his language, "that was enough." In this respect he testified that the purpose thereof was to see his son rather than defendant; that he did not on that occasion request her to return to him, and that, with the exception of the two letters, he did not make, nor cause to be made, any conciliatory overtures, although she resided within a short distance from where he was living and he passed her home daily until she left this state about four months after the separation. He admitted that during this period he had seen his wife and child walking along the streets in Ridgefield Park almost daily but that he made no effort to speak to either of them. Petitioner admitted that on one occasion he had forcibly ejected defendant from their home. She had frequently asked him for money in order that she might go to Reno to procure a divorce, thus avoiding local publicity of their marital discord. He had consulted a lawyer, and the chief of police and police recorder, respectively, of Ridgefield Park, concerning defendant's attempts to "frame" him before the separation; he anticipated trouble with defendant and had prepared to meet it long before the separation. He declared

that he possessed no knowledge of defendant having committed adultery prior to her having left this state; that one reason why he did not continue to prevail upon her to return to him was because she had, upon several occasions, told him that she would only have sexual relations with a man whom she loved; that that declaration was sufficient proof to him that she was carrying on an illicit affair with another man. He testified that he was suspicious of her conduct; that rumors had come to him to the effect that she was "running around" but that he had not confronted her with his suspicions; that, therefore, being suspicious, he did not want her to return to him. For the purpose of establishing the close alliance of defendant and Lowe prior to her leaving this state, Harry Weidlig, a police officer of Maywood, testified that on the night of July 3d, 1928, while it was still light, he apprehended defendant and Lowe in a car parked on a main traffic artery; he observed both adjusting their clothing, placed them under arrest for open lewdness and took them to police headquarters where they were booked for disorderly conduct. Lowe's identity was disclosed by his driver's license. Weidlig declared that defendant voluntarily gave her name, stated that she was married and pleaded with him and the desk lieutenant that her identity be not disclosed on the police blotter. Her supplications were acceded to and she was aliased as Jane Doe. Lowe deposited cash bail of $25 for the future appearance of defendant and himself before the police recorder. Not appearing, the bail was forfeited and prosecution abandoned. There was no testimony offered by these police officers to the effect that either defendant, or Lowe had admitted that they had been observed in the compromising position that policeman Weidlig claims he had found them. Both officers testified that neither had seen defendant or Lowe either before or after July 3d, 1928. And yet, more than six years later, both identified Lowe from his photo introduced at hearing, and both identified defendant by the simple and convenient expedient of pointing her out, seated at counsel table, in open court. The police blotter was not produced. Officer Weidlig's testimony concerning his observation of defendant and Lowe was neither

corroborated nor was I impressed by him or it. For a further reason, this court is not inclined to attach probative value to the uncorroborated testimony of a single witness in an action for divorce for the cause of adultery, particularly when such testimony is the tardy disclosure of a circumstance, so long withheld as to render the witness *particeps criminis*.

Petitioner also produced documentary evidence for the purpose of showing that defendant, masquerading under the name of Ellen E. Loree, and Lowe had jointly committed a number of criminal acts relating to the Teaneck National Bank. Petitioner contends that these criminal acts bear stalwart witness to the fact that defendant and Lowe had carried on adulterous relations throughout the period during which they had manipulated the bank's funds and records; that there could not have been a closer association of two criminals of opposite sex engaged in a common criminal purpose; that this common purpose drew defendant and Lowe so close that she no longer had any use for her husband; that her relationship with Lowe had ripened into something more than a mere acquaintance; that all of this conduct supports the charge that defendant's Nevada decree was fraudulently procured. Other than the testimony of policeman Weidlig, there was not a particle of evidence offered in proof of any adulterous conduct between defendant and Lowe prior to their marriage.

Petitioner further charges that while there is no direct proof that defendant and Lowe left this state together, the closeness in point of time of their departure, defendant's promptness in setting up her alleged residence in Nevada, the procurement by Lowe of a Mexican decree of divorce from his wife after his disappearance from this state, the marriage of defendant and Lowe within so brief a period of time after the entry of her Nevada decree, and in furtherance of their insidious plan, the adoption of the child of this petitioner and defendant, is cumulative proof of her having fraudulently invoked the jurisdiction of the Nevada court. The evidence discloses that defendant left her home at Ridgefield Park on January 19th, 1933. Lowe, too, disappeared from the Teaneck National Bank on that day and never returned there.

No proof was offered that they left this state together. Petitioner "assumes" that defendant took up her residence in Nevada on February 23d, 1933, because she filed her complaint there on April 6th, 1933, the interval between these dates being exactly six weeks, the period of residence required by the statutes of Nevada. There is no proof that she arrived in Nevada on February 23d. Having left this state January 19th, and in view of the fact that the trip by railroad from New York City to Las Vegas requires about four days, it is quite logical, if I, too, may be permitted to assume, that her arrival there was on January 23d, or approximately ten weeks before she instituted her suit. Her final decree was entered May 24th, 1933. Defendant and Lowe, however, delayed their nuptials until September 15th, 1933, or nearly four months. There is no evidence as to when they left Nevada for California, where they were apprehended and brought to this state January, 1934, nor that defendant had abandoned her domicile in Nevada with intent to establish one in California. However, she did not return to New Jersey voluntarily, and while she is presently resident in this state, there is nothing to indicate that she has set up her domicile here.

At the conclusion of petitioner's case, defendant moved to dismiss the petition for want of sufficient evidence to support a decree, reserving the right, however, in the event of such motion not prevailing, to interpose her defense. This is not the proper practice in equity procedure because a motion of that type is, in effect, in the nature of a motion to nonsuit. There is not, in this respect, any analogy between equity and law procedure; nonsuits are applicable only to causes arising before common law tribunals and cannot be resorted to in actions of an equitable nature. The reason for this is obvious. In actions brought on for hearing in courts of law, the presiding judge rules upon questions of law and the jury determines the factual issues. The object of a nonsuit in such proceedings is to withdraw the case from the jury when the issue has become narrowed to a question of law to be decided by the presiding judge. It is because of this dual nature, i. e., determination of matters of fact by the jury, and rules of law by the judge, in actions at law, that gives rise to the prac-

tice of moving for nonsuit. But there is no necessity for resorting to this procedure in equity actions because questions of law as well as issues of fact are determined by the chancellor. It is the province and duty of the chancellor to decide upon the facts and the law. *Miller* v. *Wack, 1 N. J. Eq. 204, 215; Riehl* v. *Riehl, 101 N. J. Eq. 15; 137 Atl. Rep. 787; Blue Goose Auto Service, Inc.,* v. *Blue Goose Super Service Station, Inc., 110 N. J. Eq. 438; 160 Atl. Rep. 836;* reversed, in other respects, by *110 N. J. Eq. 547; 160 Atl. Rep. 316.*

For a further reason, a motion to dismiss, with reservation, would undoubtedly tend to prolong litigation; it might not have the effect of a final judgment as to the rights of the parties because the same question may arise in future when the petitioner is able to supply the testimony which was lacking. In a court of equity the defendant must elect to offer matters in defense or rest his case. If he is willing to risk his case upon petitioner's proof, or rather, the failure of petitioner to prove his case, such conclusion is tantamount to a submission of the case on the merits to the chancellor. In *Sawyer* v. *Platt (New Jersey Chancery), 77 Atl. Rep. 1043,* Vice-Chancellor Leaming stated what appears to be the single reported rule on this subject in this state, viz., "it is not the practice of this court to entertain, at the conclusion of complainant's evidence, a motion on the part of defendant to dismiss the bill for want of sufficient evidence to support a decree. A defendant is here privileged to rest his cause upon the evidence offered by complainant, or to introduce evidence in his own behalf, at his election." While, as stated in the foregoing case, unusual circumstances were involved, the learned vice-chancellor applied, nevertheless, the rule as therein stated and which rule appears to be in complete harmony with the reported expressions of tribunals in sister states possessing equity powers. This defendant was, therefore, precluded from interposing a motion to dismiss with reservation; having moved to dismiss the petition she elected to rest her case.

Petitioner contends that because defendant offered no testimony in contradiction of his evidence, she either feared the

effect of whatever evidence she may have been able to offer or that she had no defense; that the court is without benefit of defendant's version of the situation; that because the evidence offered on petitioner's behalf having been neither denied nor contradicted, this court is "logically called upon to assume" that it is true. Defendant not having interposed a defense at the final hearing, the matter proceeded, in so far as the proofs were concerned, somewhat in the nature of an action *ex parte*. The burden is on the husband, suing for divorce, to prove his case, and all uncertainties of fact should be resolved against him. *Sheeran* v. *Sheeran, 115 N. J. Eq. 75; 169 Atl. Rep. 871.* It is also the rule, in matters of divorce, that the state is considered as a party on the theory of public policy; that in uncontested cases it frequently happens that relief is denied on petitioner's testimony; that petitioner's testimony must be carefully considered in order to ascertain if it be sufficient in itself to warrant a decree; the defendant's failure to offer evidence is not conclusive against her. *Brinkerhoff* v. *Brinkerhoff, 106 N. J. Eq. 331; 150 Atl. Rep. 679.* Ample corroboration was offered as to the marriage of the parties hereto, of the birth of their child, of the uninterrupted cohabitation of the parties in this state until September, 1932, and of petitioner's domicile in this state continuously for many years. As to defendant's separate maintenance suit: Petitioner charges that defendant's failure to prosecute that action constituted one of the elements of fraud incident to her Nevada decree; that the setting up by her of a residence in Nevada, and the rapid conclusion of her divorce proceedings there, definitely indicated her fraudulent purpose of circumventing the ability to obtain relief in this court; that the pendency of her action here barred the institution of her Nevada suit. A somewhat similar situation is found in *Fairchild* v. *Fairchild, 53 N. J. Eq. 678; 34 Atl. Rep. 10.* In that action it was contended that because the wife's separate maintenance action was pending in this court at the time of the institution of divorce proceedings by her husband in Kansas, the foreign tribunal was deprived of jurisdiction. The court of errors and appeals, however, declared the rule to be otherwise; it stated that "this conten-

tion is without force. The pendency of a suit between the same parties, and for the same cause of action, in this state is no bar to a subsequent suit brought in a sister state. The remedy of the defendant is to apply to the *court* [italics mine] in which the subsequent suit is brought to stay proceedings, or to refuse final judgment, until the suit here is determined; and the granting or refusal of such application is a matter of discretion in the court to which it is made." (Cases cited.) It does not appear from the proofs in the case at bar that an application was made to the Nevada court to stay defendant's proceedings there until her separate maintenance action in this court had been determined. A suit for separate maintenance, as distinguished from an action for divorce, contemplates solely the present financial needs of the wife by anticipating an order directing the husband to support her where the abandonment by him has not been for a justifiable cause. While the actions are, in a measure, of a kindred nature, both involving the failure of the husband to discharge a duty arising out of the marital status, yet the one contemplates temporary relief while the other finally determines the ultimate claim of the wife. An order settling alimony where the marriage relation continues and where provision for temporary support only is made, may not, therefore, properly be presented as a former adjudication in a subsequent action brought by the wife for divorce and permanent alimony. If, then, defendant's separate maintenance suit in this court had been brought to a final decree it would not have been a bar to a subsequent suit brought by her for divorce either in this or any other state. It follows, therefore, that there having been no final determination of her action in this court, her rights were no more restricted or limited than if there had been a final adjudication.

As to defendant's alleged fraud: In *Fairchild* v. *Fairchild, supra,* the court of errors and appeals held it to be the settled rule in this state that the only grounds upon which the judgment of a court of general jurisdiction can be disregarded in another state are, first, where the adjudging tribunal had no jurisdiction over the person against whom judgment was pronounced, or over the subject-matter of the litigation; and,

second, where the adjudication of the foreign tribunal had been obtained by fraud. In *Pahy* v. *Pahy, 107 N. J. Eq. 538; 153 Atl. Rep. 519,* the court of errors and appeals held that where the court in which the divorce was obtained had jurisdiction over the subject-matter, and its powers were limited to the granting of relief to a resident of the state, its adjudication that the complainant was such resident is final, unless it is made to appear that the court was led to this conclusion by fraud perpetrated upon it by the complainant; that mere suspicion that one having gone from this state to a foreign tribunal was for the purpose of obtaining a divorce with no intention of becoming a permanent resident there, is not sufficient to justify treating the decree of the foreign court as a nullity because fraud is a fact that will never be presumed but must always be clearly and convincingly proved. There is a long line of reported cases to this effect. No useful purpose will be served in citing them. Furthermore, since a decree of divorce has admittedly been entered in Nevada dissolving the marriage between the parties hereto, the burden is obviously on petitioner to establish the alleged infirmities of that decree. *Field* v. *Field, 103 N. J. Eq. 174; 142 Atl. Rep. 644.*

As to petitioner's contention that defendant was precluded from obtaining a domicile in Nevada because she was a fugitive from justice: The federal constitution, article 4, section 2, provides: "A person *charged* in any state with treason, felony, or other crime, *who shall flee from justice,* and be found in another state, shall on demand of the executive authority of the state from which he has fled, be delivered up, to be removed to the state having jurisdiction of the crime." (Italics mine.) From the numerous authorities I have examined, there appears to be marked distinction between one who is a "fugitive from justice" and one "who shall flee from justice." It was held in *Day* v. *Otis, 8 Allen (Mass.) 477,* that the word "charged," as used in the federal constitution, implies that an offense has been alleged against a person "according to the forms of law." In *Pierce* v. *Creecy, 210 U. S. 387; 28 S. Ct. 714; 5 L. Ed. 113,* it is stated that the word "charged" is to be construed in its broad signification

to cover any proceeding which a state may see fit to adopt by which a "formal accusation" is made against an alleged criminal. In *Hyatt* v. *Corkran, 188 U. S. 691, 712; 23 Sup. Ct. 456; 47 L. Ed. 657,* cited in *Taft* v. *Lord, 92 Conn. 539; 103 Atl. Rep. 644; L. R. A. 1918E, 545,* it is stated that one who is without the jurisdiction of the state when he is there wanted to answer a criminal charge does not, by reason of his absence alone, become a "fugitive from justice;" nor does he become such from the mere fact that he has "rendered himself liable to criminal prosecution" in that state. In *Ex parte Reggel, 114 U. S. 642; 5 Sup. Ct. 1148; Roberts* v. *Reilly, 116 U. S. 80; 6 Sup. Ct. 291;* and *Kingsbury's Case, 106 Mass. 223,* cited in *Drinkall* v. *Spiegel, 68 Conn. 441; 36 Atl. Rep. 830; 36 L. R. A. 486,* it was stated that the fact that a man "charged" with a crime in one state, and afterwards is found in another, has generally been regarded as *prima facie* evidence that he is a "fugitive." From the foregoing it seems that one who, being within the state, committed treason, a felony or other crime, has fled the jurisdiction when he is there wanted to answer, does not become a fugitive from justice unless and until he is formally charged therewith; that the word "charged" as used in article 4, section 2 of the federal constitution, is construed to mean that an indictment has been found or an affidavit has been made before a magistrate alleging the commission of such offense or offenses.

Defendant's Nevada decree was entered May 24th, 1933. She was not indicted until January 10th, 1934. Although she removed from this state to Nevada on January 19th, 1933, she did not, however, become a "fugitive from justice" until nearly a year later. Our statute of limitations (*2 Comp. Stat. 1910 p. 1870 § 152*), provides that no person shall be prosecuted for certain crimes unless an indictment shall be found within two years from the time of committing the offense, but "that nothing herein contained shall extend to any person fleeing from justice." The phrase "fleeing from justice" applies to a person who, having committed a crime, has removed from or secreted himself within the jurisdiction wherein the offense was committed with intent to avoid detection or prosecution, the statute ceasing to run in the meanwhile.

In *Harral* v. *Harral, 39 N. J. Eq. 279,* decided in 1884 by the court of errors and appeals, and repeatedly cited because defining the elements essential to the acquisition of the domicile, particularly in divorce matters, it was held that there must be a "voluntary" change of residence; the residence at the place chosen for the domicile must be actual; to the *factum* of residence there must be added the *animus manendi;* that that place is the domicile of a person in which he has "voluntarily" fixed his habitation, not for a temporary or special purpose, but with the present "intention" of making it his home, unless or until something which is uncertain or unexpected shall happen to induce him to adopt some other permanent home. In *Wallace* v. *Wallace, 65 N. J. Eq. 359,* the court of errors and appeals stated that it concurred in the principle that a person may legitimately move to another state in order to avail himself of the laws of that state, and this includes, necessarily, the right to remove into the jurisdiction of this state for the "purpose" of procuring a divorce, the only requirements being absolute good faith in the taking up of such residence and of the *animus manendi;* in other words, the *factum* of residence and the *animus manendi* prove the domicile. Consequently, the "intention" to acquire a new domicile, and not the "purpose" in making the change, is the pivot on which the inquiry turns. The term "residence" as used in Divorce act of 1907 (*2 Comp. Stat. 1910 p. 2021*), includes not only the *factum* of residence but also the *animus manendi;* the residence required by the statute being equivalent to domicile. *Hess* v. *Kimble, 79 N. J. Eq. 454; 81 Atl. Rep. 363.* The phrase "voluntary change of residence," as used in *Harral* v. *Harral, supra,* is construed to mean "effected by choice or volition; unconstrained of will." In this respect it might be urged that defendant did not leave this state voluntarily, but, conversely, the impelling force was conscious guilt of crimes she had committed incident to the Teaneck National Bank; that she fled the jurisdiction for the "purpose" of avoiding detection and prosecution rather than with the "intention" of establishing her domicile in Nevada. "Intention," or motive, is an operation of the mind, a mental act, which may take place but remain

confined in the mind which conceives it and never be susceptible of proof, unless it is evidenced by some act or declaration of the party which betrays it. *2 Words and Phrases (2d ser.) 1126.* "Intention" to acquire a new domicile is presumed to be voluntary until clearly and convincingly proved to the contrary; the presumption is in favor of good faith rather than unlawful motives. Consequently, a "fugitive from justice," as well as one "who shall flee from justice," may acquire a new domicile if the change is voluntarily made and the intention to so acquire, as *contra*-distinguished from the purpose, is predicated upon good faith.

As to the restraining orders: As stated, *supra,* neither the *ad interim* nor the permanent restraining order was served upon defendant. Service of both, however, was made upon her attorneys by registered mail. In *Van Doren* v. *Robinson, 16 N. J. Eq. 256,* it was held that constructive notice is knowledge imputed on presumption, too strong to be rebutted, that the knowledge must have been communicated. Even though service was made outside this state, if the matrimonial domicile of defendant was here the restraining orders were obligatory on her. *Kempson* v. *Kempson, 63 N. J. Eq. 783; 52 Atl. Rep. 360.* If, however, this court had no jurisdiction over defendant it is obvious that she was not bound to obey them.

As to defendant's domicile in Nevada: *In re Geiser's Will, 82 N. J. Eq. 311; 87 Atl. Rep. 628,* it was stated that the unity of domicile exists during coverture, unless the wife acquires one elsewhere by the husband's consent; that such consent may be either actual or constructive and may be manifested by acquiescence, by abandonment, or by such conduct inimical to cohabitation as would secure the wife a decree of divorce, *a vinculo* or *a mensa et thoro.* And again, in *Brown* v. *Brown, 112 N. J. Eq. 600; 165 Atl. Rep. 643,* it was stated that where such residence or domicile is once established it is presumed to continue unless there be proof of the acquisition of a new domicile or residence, and that to establish the latter more than a mere change of abode is requisite; the change of abode must be *animus manendi.* Also in *Tracy* v. *Tracy, 62 N. J. Eq. 807; 48 Atl. Rep. 533,*

the court of errors and appeals held that a *feme covert's* residence follows that of her husband but terminates with the reason upon which it rests; when the union between the two ceases and an attitude of hostility arises, they may each have different residences.

That defendant separated herself from petitioner for justifiable cause while both were resident here, and that petitioner abandoned defendant is amply supported by petitioner's testimony.

The rule laid down in *Stephens* v. *Evans, 105 N. J. Eq. 203; 147 Atl. Rep. 447,* is to the effect that there must be proof that defendant went to Nevada *in order* to obtain a divorce; the language of the statute (*2 Comp. Stat. 1910 p. 2041 § 33*) is clear that to void such decree the "intent" to evade our statute must appear.

It is further urged that the removal of the child of the parties from this state by defendant without petitioner's consent was unlawful and accentuates her fraud; that the adoption of the boy in Nevada by defendant and Lowe, and having his name changed to Charles Perry Lowe, demonstrated defendant's contempt for this court and further contributed to the atmosphere of illegality and fraud which prevaded the whole situation. While it is true that *2 Comp. Stat. 1910 p. 2809 § 19,* prohibits the doing of what defendant did (taking the child out of this state) particularly because this court had jurisdiction over the minor by reason, at least, of the pending separate maintenance proceedings, nevertheless, and without thought of excusing or absolving her in the premises, I cannot conceive how she could have more emphatically demonstrated her conclusion to relinquish her domicile here; she took with her her child who was, undoubtedly, her most cherished possession and whose father had evinced no desire to visit for months before her departure; she left behind nothing that would indicate her intention to return to this state. She brought about the adoption of her child and his change of name in Nevada. It is sensible to assume that this was an added reason why she proposed to continue her *bona fide* domicile in that state; she undoubtedly realized that in the event of her returning with the child to this jurisdiction,

if only temporarily, this petitioner would experience no difficulty in preventing her from again removing him from this state except under an appropriate order of this court. The child is a legitimate unemancipated minor. The rule laid down in *Rinaldi* v. *Rinaldi, 94 N. J. Eq. 14; 118 Atl. Rep. 658,* is that the domicile of a legitimate unemancipated minor whose will cannot concur with the fact of residence, is, if the father be living, the domicile of the father; that a minor cannot change his domicile of his own will. The adoption proceedings were without effect.

No clear and convincing proof was offered showing that defendant's departure from this jurisdiction was "in order" to obtain a divorce, or was with "intent" to evade our divorce statute, or was other than voluntary or was prompted by her lack of intention to acquire a domicile in Nevada, or that she was not physically and continuously within the jurisdiction of Nevada during the period required for domicile by the statutes of that state, or that her intention to remain there was not made in good faith. For a further reason, to grant petitioner the relief he asks would involve a decree against the validity of the divorce, and of the subsequent marriage, and consequently the legitimacy of the child of the marriage, and that, too, in a suit to which the child is not a party.

Defendant's Nevada decree was not fraudulently obtained. Solicitor for defendant will accordingly submit an order dismissing petitioner's petition.